IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

FRANK THON,

|                        | Plaintiff,          | Civil Action No.          |
|                        |                     | 9:13-CV-0898 (GLS/DEP)    |
| v.                     |                     |                           |

C. GRIMSHAW, *et al.*,

                              Defendants.

_____

<u>APPEARANCES</u>:                            <u>OF COUNSEL</u>:

<u>FOR PLAINTIFF</u>:

FRANK THON, *Pro Se*
03-A-6611
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

<u>FOR DEFENDANTS</u>:

HON. ERIC T. SCHNEIDERMAN          MARIA E. LISI-MURRAY, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Frank Thon, a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), has commenced this action against several DOCCS employees, pursuant to 42 U.S.C. § 1983, claiming that the various named defendants deprived him of his civil rights. In his complaint, as amended, Thon alleges that while he was incarcerated at the Clinton Correctional Facility ("Clinton"), certain of the defendants used excessive force against him, and other defendants failed to provide him with adequate medical care and deliberately ignored his serious medical needs, in violation of the Eighth Amendment.

Currently pending before the court is defendants' motion for partial summary judgment seeking dismissal of plaintiff's Eighth Amendment deliberate medical indifference claims asserted against defendants Johnson, Koenigsmann, LaValley, and Lee.[1] For the reasons set forth below, I recommend that defendants' motion be granted as to all of the

---

[1]    To the extent defendants intended to include defendant Nurse Khan in their motion, the court notes that defendant Khan was terminated as a party in this action on January 23, 2014. Dkt. No. 19. Plaintiff also asserts a deliberate medical indifference claim against defendants Grimshaw, Poupore, and Rock. Dkt. No. 30 at 24. Defendants' motion does not address plaintiff's claims against those individuals. Dkt. No. 110.

claims challenged in the motion with the exception of those asserted against defendant Lee.

I.  BACKGROUND[2]

Plaintiff is a prison inmate currently being held in the custody of the DOCCS at the Green Haven Correctional Facility, located in Stormville, New York. *See generally* Dkt. No. 30. At the times relevant to this action, however, plaintiff was confined at Clinton, which is located in Dannemora, New York. *Id.* at 2.

Plaintiff alleges that on July 31, 2010, he was the victim of a brutal assault orchestrated and carried out by defendant Corrections Sergeant C. Grimshaw and defendants Corrections Officers Tod Poupore, Betsy Whelden, Joseph Rock, Dan Phillips, and Jason Lucia. Dkt. No. 30 at 5-9. On the evening of the assault, plaintiff was transported by ambulance to the Champlain Valley Medical Center, where he remained for a period of several hours, during which time x-rays were taken, and plaintiff was told by a doctor that he may have "a few fractured ribs," punctured a lung, torn some ligaments, and bruised his kidneys. *Id.* at 12-14. Plaintiff returned to Clinton at approximately 6:00 AM on August 1, 2010, and was "placed

---

[2]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

under a mandatory medical watch for several more days due to h[o]w severe the injuries actually were." *Id.* at 14.

On August 2, 2010, Dr. Adams, a facility doctor who is not a named defendant in this action, examined plaintiff and "commented that Plaintiff may indeed have a punctured lung and instructed him to keep taking deep breaths and that it would heal itself in a few days." Dkt. No. 30 at 14; *see also* Dkt. No. 114 at 67. Notwithstanding Dr. Adams' conjecture, a report of x-rays taken on August 2, 2010, indicated only bruising, and specifically stated "[n]o obvious rib fracture is demonstrated[.]" Dkt. No. 114 at 3. Plaintiff's chest was again x-rayed on December 10, 2010; at that time the examination disclosed "old right sided rib fractures suspected." *Id.* at 5. There is no record evidence explaining why the August x-ray did not reveal a rib fracture.

On July 17, 2012, plaintiff suffered a severe heart attack requiring triple bypass surgery. Dkt. No. 30 at 19. While in the hospital in connection with that surgery, he was informed that he had diabetes and that his A1C blood sugar level was alarmingly elevated. *Id.* According to plaintiff, defendant Lee never diagnosed him with diabetes or informed him of the diagnosis. *Id.*

In his amended complaint, liberally construed, plaintiff complains that defendant Kang Lee, a doctor stationed at Clinton, failed to provide him with adequate medical treatment following the assault by corrections officers in July 2010, and for medical conditions that developed following the assault. Specifically, plaintiff alleges that defendant Lee was deliberately indifferent to his serious medical needs with respect to his complaints of chronic and acute pain following the July 2010 assault, and his complaints regarding breathing difficulties and chest pains prior to suffering a heart attack. *See, e.g.,* Dkt. No. 110-2 at 9-10, 21. Plaintiff contends that he complained to defendants Vonda Johnson, the Head Medical Administrator at Clinton; Carl Koenigsmann, the Deputy Commissioner/Chief Medical Officer for the DOCCS; and Thomas LaValley, the Superintendent at Clinton, regarding defendant Lee's inadequate medical treatment, but that those individuals ignored his pleas for proper treatment. Dkt. No. 30 at 16-21; *see also generally* Dkt. No. 119-4.

II.     PROCEDURAL HISTORY

Plaintiff commenced this action on July 31, 2013, with the filing of a complaint, accompanied by motions for (1) leave to proceed *in forma pauperis* ("IFP"); (2) the appointment of *pro bono* counsel; and (3) a

preliminary injunction. Dkt. Nos. 1, 2, 4, 5. Pursuant to 28 U.S.C. §§ 1915(e), 1915A, Senior District Judge Gary L. Sharpe reviewed plaintiff's filings and issued a decision and order on December 20, 2013, granting plaintiff's IFP application, denying the motions for appointment of counsel and a preliminary injunction, dismissing plaintiff's claims seeking monetary damages against all defendants, and otherwise accepting plaintiff's complaint for filing. Dkt. No. 14.

Before the named defendants could answer plaintiff's original complaint, plaintiff filed an amended complaint, which the court accepted for filing on May 5, 2014. Dkt. No. 32. That amended pleading names the following individuals as defendants: (1) Corrections Sergeant C. Grimshaw; (2) Corrections Officer Tod Poupore; (3) Corrections Officer Betsy Whelden; (4) Corrections Officer Joseph Rock; (5) Corrections Officer Dan Phillips; (5) Corrections Officer Jason Lucia; (6) Dr. Kang Lee, a physician at Clinton; (6) Dr. Vonda Johnson, DOCCS's Facility Health Services Director at Clinton; (7) Dr. Carl Koenigsmann, DOCCS's Deputy Commissioner/Chief Medical Officer; and (8) Superintendent Thomas LaValley. Dkt. No. 30 at 1, 3-4. Plaintiff claims that defendants Grimshaw, Poupore, Whelden, Rock, Phillips, and Lucia violated his Eighth Amendment rights during the use-of-force incident on July 31, 2010. *See*

*generally* Dkt. No. 30. In addition, he contends that defendants Grimshaw, Poupore, Rock, Lee, Johnson, Koenigsmann, and LaValley were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. *Id.*

Following the close of discovery, defendants filed the currently pending motion for partial summary judgment seeking dismissal of plaintiff's deliberate medical indifference claims asserted against defendants Johnson, Koenigsmann, LaValley, and Lee. Dkt. No. 110. Plaintiff has since responded in opposition to that motion. Dkt. No. 119. Defendants' motion is now fully briefed and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of

summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

    B.    <u>Analysis of Plaintiff's Deliberate Medical Indifference Claims</u>

        1.    <u>Legal Standard Governing Eighth Amendment Medical Indifference Claims</u>

The Eighth Amendment prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society[,] or which involve the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, . . . neither does it permit inhumane ones[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result

in pain and suffering which no one suggests would serve any penological purpose." *Id.* (quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm

faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

## 2. Defendant Lee

Liberally construed, plaintiff's amended complaint alleges that defendant Lee violated his Eighth Amendment rights by failing to address his complaints of pain beginning in September 2010. *See generally* Dkt. No. 30. Specifically, plaintiff contends that defendant Lee ignored his continued complaints of pain following the use-of-force incident with corrections staff in July 2010, and dismissed plaintiff from each appointment without an examination. *See, e.g.,* Dkt. No. 30 at 15-16, 19-20; Dkt. No. 119-3 at 17, 19. Plaintiff also contends that, at some point after the use-of-force incident while defendant Lee was still his primary care provider, he began to experience shortness of breath and severe chest pains. *See, e.g.*, Dkt. No. 119-3 at 18. According to plaintiff, defendant Lee ignored these complaints "without taking any vital signs or any kind of evaluation or examination or even ordering any X-rays—telling the Plaintiff he had arthritis in his chest and that every body Plaintiff's age gets that." *Id.*; *see also* Dkt. No. 30 at 18.

While defendants have moved for partial summary judgment on defendant Lee's behalf, they have not included any evidence that directly addresses plaintiff's allegations regarding that defendant. For example, while defendants Johnson and Koenigsmann have submitted declarations

and exhibits in support of defendants' argument that they are entitled to summary judgment, there is no such declaration from defendant Lee. In lieu of submitting a declaration or affidavit from Dr. Lee, defendants suggest in their memorandum of law that summary judgment is appropriate with respect to this individual because, "based on the medical documentation and information available at such time, no reasonable physician in Dr. Lee's position, [sic] would have any reason to believe that Plaintiff's pain was not the result from [sic] his former injuries, i.e., pain resulting from old rib fracture, back surgery in 2005 and heart surgery in 2011." Dkt. No. 110-6 at 9. While this amounts to an argument that defendant Lee is entitled to summary judgment based on qualified immunity, defendants make no effort to cite to the voluminous record in support of an argument for summary judgment either on that ground or on the merits.[3]

Based on my independent review of the evidence, I find that a reasonable factfinders could conclude both that (1) plaintiff suffered from serious medical conditions at the relevant times, including chronic back pain, the injuries suffered following the assault by corrections officers in July 2010, diabetes, and heart disease; and (2) defendant Lee ignored

---

[3]     I will address defendants' qualified immunity argument below in part III.C. of this report.

plaintiff's complaints regarding those conditions with the requisite deliberate indifference to his health and safety. With respect to the objective element of the deliberate medical indifference inquiry, I find that there is record evidence from which a reasonable factfinder could conclude that plaintiff was the victim of a brutal assault while in prison, and that defendant Lee ignored plaintiff's complaints of pain in his back, ribs, arm, left lung, and kidneys following the assault. *See, e.g.,* Dkt. No. 119-4 at 39-41 (plaintiff's grievance complaining about the care defendant Lee has provided for his chronic back pain and the injuries he sustained after the assault). Indeed, the record evidence reflects that plaintiff had a chronic low-back condition prior to the assault in July 2010 that was or could have been exacerbated by the assault, but in any event remained a steady source of serious pain to plaintiff at the relevant times. *See, e.g.,* Dkt. No. 110-4 at 16-19 (letter from plaintiff's attorney detailing Thon's history of back treatment). The record also shows that plaintiff may have suffered a broken rib from the alleged assault that may have caused him long-term pain in the years that followed. *See, e.g.,* Dkt. No. 119-4 at 14-15 (x-ray reports from (1) August 2, 2010, showing "no obvious rib fracture"; and (2) December 10, 2010, showing an "[i]rregularity . . . on the right chest wall that appears most consistent with a remote healed

fracture"); *see also* Dkt. No. 119-4 at 19. Plaintiff's medical records further demonstrate that in the months leading up to his heart attack in July 2012, Thon complained to defendant Lee of chest pains and shortness of breath. *See, e.g.,* Dkt. No. 119-4 at 26-28 (letter from plaintiff to defendant Koenigsmann explaining that, on April 23, 2012, plaintiff informed defendant Lee that he was experiencing difficulty breathing and "stabbing pain in [his] left-side ribs" and that defendant Lee diagnosed this issue as arthritis). Plaintiff additionally contends that defendant Lee failed to diagnose his diabetes, and it was not until plaintiff suffered a heart attack and medical providers in the hospital alerted plaintiff to this condition that he became aware of his blood-sugar issues. *See, e.g.,* Dkt. No. 30 at 19. All of this evidence, when considered in the light most favorable for plaintiff, gives rise to a genuine dispute of material fact with respect to whether plaintiff suffered from a serious medical condition. In arriving at this conclusion, I remain mindful that the Second Circuit has instructed that deliberate medical indifference claims are fact-specific, "the relevant medical need can only be identified in relation to the specific factual context in each case[, and] the severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003). In

this case, in light of plaintiff's preexisting low-back condition, the injuries he suffered as a result of the alleged assault in July 2010 and his complaints of pain thereafter, and his complaints of chest pain and shortness of breath and the heart attack ensuing three months later, I find that a reasonable factfinder could conclude that plaintiff suffered from one or more objectively serious medical conditions.

With respect to the subjective element, there is record evidence from which a reasonable factfinder could conclude that defendant Lee intentionally and deliberately ignored plaintiff's complaints of pain after learning that plaintiff suffered at least some of his injuries at the hands of corrections officers by terminating office visits without even examining him. *See, e.g.,* Dkt. No. 30 at 15-16. Plaintiff has also submitted evidence reflecting that when he began to experience chest pains, defendant Lee "dismissed" the complaints, failed to undertake any kind of examination of plaintiff, and told plaintiff it was caused by arthritis. Dkt. No. 119-3 at 18; Dkt. No. 119-4 at 26. According to plaintiff, defendant Lee (incorrectly) correlated plaintiff's complaints of chest pain with the assault by corrections officers and thereafter ignored plaintiff's complaints and terminated office visits. Dkt. No. 119-3 at 18-19. Viewed in the light most favorable to plaintiff, I find genuine disputes of material fact exist as to

whether defendant Lee disregarded plaintiff's concerns with deliberate indifferent to his serious medical needs.[4] Accordingly, I recommend defendants' motion be denied to the extent it seeks dismissal of plaintiff's deliberate medical indifference claim against defendant Lee on the merits.

### 3. Defendants Johnson, Koenigsmann, LaValley

Plaintiff has asserted deliberate medical indifference claims against defendants Johnson, Koenigsmann, and LaValley in their capacities as supervisors. *See, e.g.,* Dkt. No. 30 at 25-26. In particular, plaintiff contends that he notified defendants Johnson, Koenigsmann, and LaValley of the alleged inadequacy of the treatment he was receiving from defendant Lee, but that none of them took any steps to address plaintiff's complaints. *Id.*

---

[4]     As was noted above, defendants have not submitted a declaration from defendant Lee in support of the pending motion. *See generally* Dkt. No. 110. In addition, the record includes only a few of plaintiff's medical records from in and around the time of the alleged assault by corrections officers on July 31, 2010. Specifically, defendants have provided (1) x-ray reports from August 2, 2010 and December 10, 2010, Dkt. No. 114 at 3; (2) a "request and report of consultation" reflecting that plaintiff was seen by Nurse Simpson on September 30, 2010, with a notation "NSC," *id.* at 72; and (3) a "request and report of consultation" reflecting that plaintiff was seen by defendant Lee on September 30, 2010 for a "primary care" visit, noting that it was a follow-up visit to plaintiff's trip to the emergency room, *id.* at 71. In addition, there are no "ambulatory health records progress notes" in the record documenting treatment received by the plaintiff prior to June 3, 2011. *Id.* at 74-105. The "request and report of consultation" from plaintiff's visit with defendant Lee on April 23, 2012, in which plaintiff alleges he specifically complained of chest pains and difficulty breathing, notes only that plaintiff "want[ed] shower permit/[complained of] pains all over." *Id.* at 55. In my view, the sparse evidence defendants have provided with respect to defendant Lee do not undermine plaintiff's allegations and, in any event, do not eliminate the genuine disputes of material fact regarding whether plaintiff suffered a serious medical condition and/or defendant Lee acted with deliberate indifference.

It is well-settled that in order to succeed on a section 1983 civil rights claim, a plaintiff is required to establish that each of the named defendants was personally involved in the alleged constitutional violation. *See, e.g., Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). The personal involvement of supervisors, like defendants Johnson, Koengismann, and LaValley, however, "cannot rest on *respondeat superior*." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 554 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501. With this backdrop in mind, I have proceeded to analyze each of the supervisory defendants separately.

a. Defendant Johnson

According to the record evidence, defendant Johnson learned of plaintiff's complaints regarding his medical treatment as early as January 12, 2010, through a letter from plaintiff's attorney. Dkt. No. 119-4 at 89. In that letter, counsel asked defendant Johnson to address why plaintiff was not receiving the treatment recommended by a specialist in November 2009. *Id.* Specifically, the letter indicates that the specialist told plaintiff "he needed to get X-rays, a second mattress to sleep on, a back brace, and either an increase or a complete change in the medication he was receiving at that time." *Id.* At the time the attorney wrote to defendant Johnson, plaintiff had only received the recommended x-rays. *Id.* Defendant Johnson responded on January 22, 2010, advising plaintiff's attorney of plaintiff's "current plan of care," which included a change in pain medication, availability of a TENS unit for personal use, additional x-rays, neurosurgical follow-up appointment, and special-ordering a lumbar corset. *Id.* at 90. Defendant Johnson also explained that many inmates request a second mattress but that the DOCCS cannot accommodate all such requests received. *Id.*

Plaintiff's attorney wrote defendant Johnson again on March 12, 2010, reiterating his requests for a second mattress, additional batteries

for the TENS unit, and that the back brace be fitted specifically for plaintiff.

Dkt. No. 119-4 at 92-94. Defendant Lee responded to the attorney in a

letter dated April 13, 2010, noting as follows:

> Inmate Thon had a lumbar laminectomy in January 2005. After surgery, he has been complaining of low back pain with radiating pain and has had treatment for pain at the pain clinic. Physical Therapy has also been completed. We have provided a medline criss-cross support which is functioning the same as a lumbar corset. His bed has been changed to a steel flat bed with moderately thick mattress to help the discomfort. Double mattresses are not allowed. 9 volt batteries for his TENS unit has [sic] been ordered. Inmate Thon had an [electromyography] test done on 6/29/05 because of his continuous radiating pain to his right leg. The facility Physician has advised that the result was normal.

Dkt. No. 119-4 at 95.

On October 1, 2010, defendant Johnson responded to a letter from

plaintiff.[5] Dkt. No. 110-4 at 47. In the letter, defendant Johnson indicated to

plaintiff that he had a scheduled call-out to see defendant Lee in five days,

at which time he should discuss his concerns. *Id.* In addition, plaintiff was

informed that he is likely eligible for programming in "Industries" subject to

some lifting restrictions. *Id.* Defendant Johnson wrote a note to defendant

Lee on this letter, stating "Dr. Lee You are seeing [plaintiff] 10/06 . . .

---

[5] The court has been unable to locate in the record the letter from plaintiff to defendant Johnson that triggered the response.

please read below. He should be able to program in Industries perhaps w/ lifting restrictions." *Id.* (ellipsis in original).

The next correspondence with respect to the plaintiff involving defendant Johnson occurred in mid-June 2011, when both plaintiff and his attorney wrote to her regarding plaintiff's medical care. Dkt. No. 110-4 at 16-19, 56; *see also* Dkt. No. 30 at 16. In plaintiff's letter, dated June 15, 2011, he acknowledged that he received a renewed medical shower pass and cane permit and requested that he be assigned a new primary medical provider because defendant Lee "consistently tell[s] [plaintiff] that there is nothing wrong with [him]" and that he is imagining the aches and pains of which he continuously complains. Dkt. No. 110-4 at 56. There is no record that plaintiff received a response to this letter.[6] According to defendant Johnson, she did not receive the attorney's letter dated June 16, 2011, but responded to a follow-up communication sent by the attorney on July 21, 2011. Dkt. No. 110-4 at 21. In defendant Johnson's letter dated August 23, 2011, she notes that plaintiff received the two permits he was seeking and was transferred to a different location within Clinton that should make showering easier. *Id.* She also informed the attorney that the report of plaintiff's neurosurgeon appointment from October 2010 "was

---

[6]     It is possible that defendant Johnson responded to this letter from plaintiff in a letter dated October 11, 2011, which is discussed below.

fairly unremarkable" and it was "recommended that he follow up on an as needed basis only." *Id.*

On September 15, 2011, plaintiff's attorney wrote defendant Johnson again disputing that Thon had received adequate medical care to date. [Dkt. No. 110-4 at 23-26](#). In particular, the attorney complained that plaintiff had not been afforded a cane, a back brace, or the MRI that the neurosurgeon had recommended in the fall of 2010. *Id.* at 23. Defendant Johnson responded by letter dated October 13, 2011, observing that, although plaintiff was issued a permit for use of a cane in June 2011, he did not report to medical staff that he had not received one. *Id.* at 28. She also noted that plaintiff had been "ambulating normally" throughout Clinton without the use of a cane. *Id.* Defendant Johnson further explained that the medical "literature does not support the medical efficacy of the use of [a hard-cased back brace] in the treatment of chronic back pain," which is why he had not been fitted for one and one had not been ordered for him. *Id.* Finally, defendant Johnson stated that MRI testing was not administered to the plaintiff because, based upon the visit to the neurosurgeon in the fall of 2010, "there was not a clear indication for one at that time," adding that plaintiff was not interested in an MRI "at the present time and . . . signed a refusal to such." *Id.*

The record evidence also includes a letter from defendant Johnson to plaintiff dated October 11, 2011. Dkt. No. 110-4 at 49. In it, defendant Johnson advised plaintiff that he may be "overusing" the TENS unit. *Id.* She also explained that his medical provider discontinued the permit for the cane because he had a normal gait without it and there was no need for it in light of the absence of a neurological deficit or balance impairment. *Id.*

On October 19, 2012, plaintiff wrote a letter to defendant Johnson asking that his medical showers pass be renewed, and that he be informed regarding the "protocol" for acquiring his own medical care. Dkt. No. 110-4 at 60-63. Defendant Johnson responded on October 23, 2012, approving the medical showers permit and referring plaintiff to the appropriate regulation for "the process for seeking an outside consultant of choice." *Id.* at 29, 65. Plaintiff again wrote to defendant Johnson on October 24, 2012, requesting the "protocol" for obtaining independent medical care and asking that he be assigned a different primary care provider. Dkt. No. 119-4 at 83-84. While there is no record that defendant Johnson responded to that letter, it is plausible that plaintiff sent it before receiving Johnson's letter from the day before.

The last correspondence in the record involving defendant Johnson is a letter from plaintiff dated December 14, 2012. Dkt. No. 119-4 at 86-87. In that letter, plaintiff pleaded with defendant Johnson to assign him a different medical provider because defendant Lee ignored plaintiff's several complaints, including the chest pains experienced by the plaintiff prior to his heart attack in July 2012. *Id.* There is no evidence in the record that defendant Johnson ever responded to this letter.

In light of all of the above-described communications between plaintiff or his attorney and defendant Johnson, I recommend that defendants' motion be granted and the claims asserted against defendant Johnson be dismissed. In large part, defendant Johnson timely responded to inquiries by the plaintiff and his attorney regarding plaintiff's complaints, and defendant Johnson's responses reflected that she was aware of the treatment being provided to plaintiff and offered explanations for the decisions rendered regarding plaintiff's care. Although plaintiff complained that defendant Lee was disregarding his various complaints, the record demonstrates that defendant Johnson did not ignore plaintiff but instead monitored his care and made adjustments where necessary. In addition, defendant Johnson's letters to plaintiff and his attorney demonstrate that some of plaintiff's requests, like plaintiff's request for additional MRI

testing, a cane, or a specific type of back brace, were denied at certain times because they were not deemed medically necessary. To the extent plaintiff disagrees with those decisions, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

Based on the record evidence now before the court, I find that no reasonable factfinder could conclude that defendant Johnson acted with the requisite deliberate indifference to plaintiff's serious medical conditions, and therefore recommend that plaintiff's claim against her be dismissed.

### b. Defendant Koenigsmann

The first time plaintiff claims to have contacted defendant Koenigsmann regarding the alleged inadequate medical treatment he received at Clinton was in a letter dated April 4, 2012.[7] Dkt. No. 30 at 17; Dkt. No. 119-4 at 4-6. Defendant Koenigsmann referred plaintiff's letter to Rita Grinbergs, the DOCCS Regional Health Services Administrator, who responded to plaintiff in writing on May 7, 2012. Dkt. No. 119-4 at 24. Grinbergs informed plaintiff that his concerns had been investigated, and that the investigation revealed that he was seen by defendant Lee in January 2012, he had been using a TENS unit since 2010, medication had

---

[7]    Plaintiff sent defendant Koenigsmann a follow-up letter on April 10, 2012. Dkt. No. 30 at 18; Dkt. No. 119-4 at 22-23.

been ordered on his behalf, and a shower permit was issued as recently as April 23, 2012. *Id.* Grinbergs encouraged plaintiff to continue "bring[ing] [his] medical concerns to the attention of the health care staff using the existing sick call procedure." *Id.*

On May 11, 2012, plaintiff again wrote to defendant Koenigsmann. Dkt. No. 30 at 18; Dkt. No. 119-4 at 26-28. In that letter, plaintiff corrected certain mistakes he alleges Grinbergs made in her first letter to plaintiff, and accused defendants Koenigsmann, Lee, and Johnson of exercising deliberate indifference to his medical needs. Dkt. No. 119-4 at 26-28. On June 5, 2012, Grinbergs responded to plaintiff, informing him that his complaints regarding his medical care were being addressed through the Inmate Grievance Program ("IGP") at Clinton as a result of grievances filed by plaintiff against defendants Lee, Johnson, and Koenigsmann on or about April 23, 2012. *Id.* at 29.

Plaintiff next contacted defendant Koenigsmann on December 18, 2012. Dkt. No. 30 at 20; Dkt. No. 119-4 at 31. At that time he requested that defendant Koenigsmann become involved in his treatment at Clinton because he continued to experience problems with defendant Lee. Dkt. No. 119-4 at 31. On December 26, 2012, Grinbergs wrote to plaintiff advising him that his concerns were being addressed through the IGP at

Clinton in light of pending grievances filed by him. *Id.* at 33; *see also* Dkt. No. 110-3 at 12.

As was noted above, in order to succeed on a section 1983 civil rights claim, a plaintiff is required to establish that each of the named defendants was personally involved in the alleged constitutional violation. *See, e.g., Wright*, 21 F.3d at 501. A supervisor, like defendant Koenigsmann, can be found personally involved if he learned of an ongoing violation and failed to remedy it. *See, e.g., Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986). In this case, plaintiff contends that defendant Koenigsmann ignored his concerns regarding his medical treatment after receiving three letters from plaintiff outlining his needs. *See generally* Dkt. No. 30. As a prison supervisor, however defendant Koenigsmann was entitled to refer plaintiff's letters to his subordinate, Rita Grinbergs, and rely on her to conduct an investigation and response without rendering himself personally involved in the constitutional violations alleged in plaintiff's letters. *See, e.g., Vega v. Artus*, 610 F. Supp. 2d 185, 199 n.13 (N.D.N.Y. 2009) (Suddaby, J.) ("Prison supervisors are entitled to refer letters of complaint to subordinates, and rely on those subordinates to conduct an appropriate investigation and response, without rendering the supervisors personally involved[.]" (citing cases)); *accord, Coffeey v.*

*Hollenbeck*, No. 14-CV-0196, 2016 WL 770087, at \*12 (N.D.N.Y. Jan. 27, 2016) (Hummel, M.J.), *adopted by* 2016 WL 796081 (N.D.N.Y. Feb. 22, 2016) (Hurd, J.); *Rush v. Fischer*, 923 F. Supp. 2d 545, 552 (S.D.N.Y. 2013).[8] Accordingly, because the record reflects that on each of the three occasions plaintiff contacted defendant Koenigsmann his complaints were referred to Grinbergs, I recommend the court dismiss plaintiff's claims asserted against defendant Koenigsmann for failure to establish his personal involvement.

c. Defendant LaValley

The record reflects that plaintiff filed grievances against defendants Lee, Johnson, and/or Koenigsmann on September 8, 2011, April 23, 2012, October 24, 2012, November 30, 2012, and January 24, 2013. Dkt. No. 30 at 17-21; Dkt. No. 110-2 at 9-11, 20-23, 39-40, 46-47, 55-58; Dkt. No. 119-4 at 39-41, 45-48, 58-59, 63-64, 76-79. Each of those grievances was denied by the Inmate Grievance Review Committee ("IGRC"), *see, e.g.,* Dkt. No. 110-2 at 15, 25, 48, 60-61, and plaintiff's appeals of the decisions by the IGRC to defendant LaValley were subsequently denied. Dkt. No. 110-2 at 18, 31, 44, 51, 64; Dkt. No. 119-4 at 43, 50, 66, 81.

---

[8]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

Thon alleges that defendant LaValley was deliberately indifferent to his serious medical needs by denying each of his grievance appeals filed by him concerning his medical treatment while at Clinton. *See generally* Dkt. No. 30.

In this circuit, it remains uncertain as to whether a supervisor may be found personally involved in an alleged constitutional violation where the only allegation is that he denied a plaintiff's grievance. *See, e.g., McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) (stating, in dicta, that "it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of"); *Burton v. Lynch*, 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009) (citing cases and noting disagreement among courts). Those courts that have decided that a supervisor is not personally involved, however, have generally relied on the fact that the supervisor was unable to remedy the alleged violation at the time he learned of it. *See, e.g., Burton*, 664 F. Supp. 2d at 360-61 ("[T]his Court finds most persuasive the many courts in this Circuit which have held that an alleged constitutional violation complained of in a grievance must be 'ongoing' in order to find personal involvement, such that the 'supervisory official who reviews the grievance can remedy it directly.'" (quoting *Vega*, 610 F. Supp. 2d at 198 (alteration omitted)). In

this case, plaintiff filed grievances against defendants Lee, Johnson, and

Koenigsmann for *ongoing* inadequate medical care. *See generally* Dkt.

No. 110-2 (defendants' attorney declaration and exhibits, detailing

plaintiff's grievances that complain of continuous inadequate medical

treatment from as early as July 2010 through January 24, 2013). In

addition, it is worth noting that there is no record evidence that defendant

LaValley did not have the authority to remedy the alleged inadequate

medical care. Accordingly, I find that there is sufficient evidence in the

record from which a reasonable factfinder could conclude that defendant

LaValley was personally involved in the alleged denial of adequate

medical treatment. *Cf. McKenna*, 386 F.3d at 438 (finding that the

defendant deputy superintendent of the facility was personally involved in

the alleged deliberate medical indifference because "[w]hen allegations of

improperly denied medical treatment come to the attention of a supervisor

of a medical program, his adjudicating role concerning a grievance cannot

insulate him from the responsibility for allowing the continuation of

allegedly unlawful policies within his supervisory responsibility").

　　　As for the subjective element of a deliberate indifference claim, I find

that plaintiff's grievances are sufficiently specific to have alerted defendant

LaValley of plaintiff's serious medical conditions and that defendant Lee

was effectively ignoring them for an extended period of time. *See, e.g.,* Dkt. No. 119-4 at 39-41, 45-48, 58-59, 63-64, 76-79. Defendant LaValley's role as the adjudicator of plaintiff's appeal, however, was limited to determining whether the IGRC's denial should be affirmed. Based on his detailed responses to plaintiff's appeals, it appears that defendant LaValley undertook at least some investigation into each of the grievances. *See, e.g.,* Dkt. No. 110-2 at 18, 31, 44, 51, 64. It is not clear whether defendant LaValley referred those investigations to a subordinate or instead personally reviewed plaintiff's medical records and spoke to the necessary medical providers in rendering his determinations on plaintiff's appeals. In either case, I find that no reasonable factfinder could conclude defendant LaValley acted with reckless disregard to plaintiff's health and safety by affirming the IGRC's denials of plaintiff's grievances after an investigation. While it is not clear in the record whether defendant LaValley had the authority to remedy plaintiff's medical issues, it is clear that he is not a physician, and the mere act of denying plaintiff's appeals does not demonstrate the requisite culpability required for a deliberate indifference claim, which is demonstrated "by actions characterized by 'wantonness.'" *Blyden*, 186 F.3d at 262; *see also Salahuddin*, 467 F.3d at 280 ("Deliberate indifference is a mental state equivalent to subjective

recklessness, as the term is used in criminal law."). Accordingly, I recommend dismissal of plaintiff's claim asserted against defendant LaValley.

C.    Qualified Immunity

Defendants also seek dismissal of plaintiff's deliberate medical indifference claims against defendants Johnson, Koenigsmann, LaValley, and Lee on the grounds of qualified immunity. Dkt. No. 110-6 at 10-11. In the event the above recommendations are adopted, the only remaining defendant for consideration of this argument is defendant Lee. For that reason, I have limited my analysis regarding qualified immunity to that individual.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."

*Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged

conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However, '[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

    In this case, defendants argue they are entitled qualified immunity only on the grounds that it was reasonable for them to believe that their actions did not violate plaintiff's constitutional rights. Dkt. No. 110-6 at 10-11. Assuming, as defendants have for purposes of their qualified immunity argument, that defendant Lee violated plaintiff's clearly established

constitutional right to receive adequate medical care while incarcerated, I find that reasonable factfinders could disagree as to whether a prison official in defendant Lee's position would conclude that his conduct was objectively reasonable and not in violation of plaintiff's constitutional rights. The evidence in the record suggests that plaintiff continuously complained of pain in various forms for years following an allegedly brutal assault by corrections officers and also complained to defendant Lee of breathing difficulties and chest pains just months before he suffered a heart attack. According to plaintiff, and only vaguely contested by defendants and the evidence they submitted in support of their motion, defendant Lee took virtually no steps to address plaintiff's objectively serious complaints. If plaintiff's version of the events is credited by a factfinder, it would then be reasonable for the factfinder to conclude that a primary care provider in defendant Lee's position would know that he was violating plaintiff's established constitutional right to adequate medical care by failing to address plaintiff's complaints. Accordingly, I recommend the court deny defendants' motion to the extent it seeks dismissal of plaintiff's claim asserted against defendant Lee on qualified immunity grounds.

IV.  SUMMARY AND RECOMMENDATION

Defendants seek dismissal of plaintiff's deliberate medical indifference claims asserted against certain of the remaining defendants. While those claims interposed against defendants Johnson, Koenigsmann, and LaValley in their capacities as supervisors should be dismissed, I find that a reasonable factfinder could conclude that defendant Lee was aware of, and disregarded, plaintiff's serious medical conditions. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for partial summary judgment (Dkt. No. 110) be GRANTED in part and DENIED in part, as follows:

(1)  Plaintiff's deliberate medical indifference claims should be dismissed as to defendants Johnson, Koenigsmann, and LaValley; and

(2)  Plaintiff's deliberate medical indifference claims asserted against defendant Lee should survive and proceed to trial; and it is further

RECOMMENDED that, in the event the above recommendations are adopted, the remaining claims for trial in this matter assert (1) Eighth Amendment violations based upon the use of excessive force by defendants Grimshaw, Lucia, Phillips, Poupore, Rock, and Whelden; and

(2) deliberate medical indifference on the part of defendants Grimshaw,
Lee, Poupoure, and Rock.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge
written objections to the foregoing report. Such objections must be filed
with the clerk of the court within FOURTEEN days of service of this report.
FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE
APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),
72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this
report and recommendation upon the parties in accordance with this
court's local rules.

Dated:     August 26, 2016
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

2016 WL 770087
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gene M. Coffeey, Plaintiff,

v.

N. Hollenbeck; et al., Defendants.

No. 9:14–CV–196 (DNH/CFH)
|
Signed 01/27/2016

**Attorneys and Law Firms**

GENE M. COFFEEY, Plaintiff Pro Se, 34611, CNYPC,
P.O. Box 300, Marcy, New York 13403.

COLLEEN D. GALLIGAN, ESQ., Assistant Attorney
General, HON. ERIC T. SCHNEIDERMAN, Attorney
General for the State of New York, Attorney for
Defendants, The Capitol, Albany, New York 12224-0341.

**REPORT–RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE
JUDGE

**\*1** Plaintiff Gene M. Coffeey ("Coffeey" or "Plaintiff"),
a resident of Central New York Psychiatric Center
("CNYPC") who was, at all relevant times, in the custody
of the New York State Office of Mental Health ("OMH"),
brings this action pursuant to 42 U.S.C. § 1983. Dkt.
No. 1 ("Compl."). Presently before the undersigned is
defendants' motion for summary judgment pursuant to
Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 56.
Dkt. No. 24. Coffeey did not oppose the motion. For
the following reasons, it is recommended that defendants'
motion be granted.

## I. FAILURE TO RESPOND

Coffeey failed to submit any opposition papers to
defendants' motion for summary judgment. Coffeey
requested an extension of time to file his response to
the present motion. Dkt. No. 31. Despite the Court
granting two extensions, Coffeey has not submitted an
opposition to defendants' motion for summary judgment.
Dkt. Nos. 32, 36. Coffeey was notified of the consequences
of failing to respond to a summary judgment motion. [2]
Dkt. No. 27. Given this notice and the two extensions for
Coffeey to file opposition papers, it is readily apparent
that Coffeey was adequately apprised of the pendency of
the motion and the consequences of failing to respond.
"Where a non-movant fails to adequately oppose a
properly supported factual assertion made in a motion
for summary judgment, a district court has no duty to
perform an independent review of the record to find proof
of a factual dispute, even if that non-movant is proceeding
*pro se.*" *Jackson v. Onondaga County,* 549 F.Supp.2d 204,
209 (N.D.N.Y.2008) (footnotes omitted). [3]

## II. BACKGROUND

In support of the motion, defendants filed a Statement of
Material Facts. [4] To the extent that the "facts" asserted by
defendants are supported by the record, the undersigned
will consider them in the context of the within motion. The
facts recited are for the relevant time period as referenced
in the complaint.

### A. Facts

**\*2** The facts are related herein in the light most favorable
to Coffeey as the nonmoving party. *See* subsection III(A)
*infra.* At the time of the incidents described in the
complaint, Coffeey was confined at CNYPC. Dkt. No.
24–1 (Statement of Material Facts) ¶ 1.

### 1. Coffeey's Confinement from May
### 28, 2013 through June 10, 2013

On May 28, 2013, at approximately 5:36 a.m., Coffeey
was observed skipping his turn for the shower. Dkt. No.
25 (Exhibit A to the Affirmation of Colleen D. Galligan
("Galligan Aff.")) at 8. [5] When he was confronted by
staff, Coffeey became loud and argumentative. *Id.* On
the same day, the Treatment Team Leader issued a "Loss of
Privileges" report indicating that Coffeey would be last on
the Unit Shower List, effective May 29, 2013. Dkt. No.
25–1 (Galligan Aff. Exh. A) at 48.

On May 30, 2013, at approximately 8:20 a.m., a Secure Care Treatment Aide ("SCTA") observed Coffeey become "verbally and physically assaultive once he was told about the restriction" imposed by the Treatment Team. Dkt. No. 25 at 20. Coffeey was "pointing and swinging his ... closed fist." [6] *Id.* The SCTA "dropped the red phone" and plaintiff was directed to the "side room." *Id.* Plaintiff received medication and breakfast without further incident. *Id.*

On May 30, 2013, at 12:15 p.m., due to Coffeey's "threatening and impulsive behavior," a physician completed a "Physician Order Form—Constant Observation." [7] Dkt. No. 25–1 at 50–51. The Order would remain in effect until May 31, 2013 at 12:15 p.m. *Id.* The Order restricted Coffeey to "finger food" and removed him from off-ward activity. [8] *Id.* Coffeey was ordered to eat and sleep in the side room and was not permitted to use any sheets, pillow cases, razors or pens. *Id.* at 50. The CNYPC Constant Observation Policy mandates that the "prescriber[,]" "must [reassess] the patient/resident at least every 24 hours, and write[ ] a new order ... to extend Constant Observation." Dkt. No. 26 (Exhibit A to the Declaration of Anthony Gonzalez ("Gonzalez Decl.")) at 55.

On May 30, 2013, at approximately 2:06 p.m., plaintiff began "yelling" and "swearing" at an SCTA and insisted on eating in the dining room. Dkt. No. 25 at 22. Coffeey was "loud and argumentative" as he returned to his room. [9] *Id.* Later that evening, Coffeey told a nurse, "I feel like hurting myself." Dkt. No. 26–1 (Exhibit A to the Declaration of Nicholas Hollenbeck ("Hollenbeck Decl.")) at 5. Dr. Kaskiw was notified, spoke with Coffeey and prescribed medication. [10] *Id.*

On May 31, 2013, Coffeey was observed "mumbl[ing] indiscernibly, pac[ing] in the sideroom[,]" and "glar[ing] at [the] nurse." Dkt. No. 25 at 34. On May 31, 2013, due to plaintiff's "threatening and impulsive behavior," a physician renewed the Observation Order. Dkt. No. 25–1 [11] at 53–54. The Order imposed the same restrictions as the prior Order and remained in effect until June 1, 2013 at 12:15 p.m. *Id.* at 53.

**\*3** On June 1, 2013, Coffeey required numerous prompts to wake for medication, ignored staff's requests and was argumentative. Dkt. No. 25 at 43. On June 1, 2013,

due to plaintiff's "threatening and impulsive behavior," a physician renewed the Observation Order. Dkt. No. 25– 1 [12] at 55–56. The Order imposed the same restrictions as the prior Orders and remained in effect until June 2, 2013 at 12:15 p.m. *Id.* When Coffeey was advised of the decision, he cursed at staff. Dkt. No. 25 at 43.

On June 2, 2013, Coffeey was upset because he slept in the side room. Dkt. No. 25 at 44. Coffeey became argumentative when staff explained the Constant Observation Order. *Id.* Due to plaintiff's "threatening and impulsive behavior," a physician renewed the Observation Order. Dkt. No. 25–1 [13] at 57–58. The Order imposed the same restrictions as the prior Orders and remained in effect until June 3, 2013 at 12:15 p.m. *Id.*

On June 3, 2013, due to plaintiff's "impulsive" behavior, a physician renewed the Constant Observation Order. Dkt. No. 25–1 [14] at 59–60. The Order imposed the same restrictions as the prior Orders and remained in effect until June 4, 2013 at 12:15 p.m. *Id.*

On June 3, 2013, at approximately 1:00 p.m., Coffeey was evaluated by a physician. [15] Dkt. No. 25 at 3–5. The physician discontinued the Constant Observation Order. *Id.* at 4. However, due to Coffeey's "threatening and daring" behavior, the physician placed Coffeey in the Motivation on Deck ("MOD") Unit and alternate sleep on Ward 504. [16] Dkt. No. 25–1 at 47. Coffeey refused to complete his behavioral chain analysis ("BCA") and refused to sign the MOD placement form. *Id.*

On June 4, 2013, at 10:03 p.m., defendant SCTA Nicholas S. Hollenbeck ("Hollenbeck") was on duty in Ward 405 and observed plaintiff consume his dinner, shower and use the bathroom. Dkt. No. 25 at 69. Hollenbeck prepared a Progress Note indicating that, "[r]esident remains on ward 504." *Id.* Coffeey was asked whether he wished to utilize the day room and Coffeey declined. *Id.* Coffeey was given a pen to complete his BCA. *Id.*

On June 7, 2013, June 8, 2013 and June 10, 2013 Coffeey was confined to Wards 405 and 504. Dkt. No. 25–1 at 1– 21; Dkt. No. 26 at 12–17.

### 2. Correspondence with Mental Hygiene
### Legal Services and Investigation

On June 7, 2013, Megan E. Dorr ("Dorr"), Esq., Senior Attorney at Mental Hygiene Legal Services, sent a letter to defendant Anthony Gonzalez ("Gonzalez"), Director of Risk Management at CNYPC. Dkt. No. 24–4 (Declaration of Anthony Gonzalez) ¶¶ 1–2; Dkt. No. 26 at 24. Dorr conveyed Coffeey's concerns regarding his confinement to the side room from May 29, 2013 through June 3, 2013 without sheets, blankets, pens or paper. Dkt. No. 26 at 24. Coffeey also claimed that he was not permitted to call his family, receive mail or correspond with his family or counsel. *Id.* Coffeey further asserted that he was not seen by a physician during this time frame and that he was unable to complete his BCA because he was not provided with any assistance. *Id.* Dorr asked Gonzalez to investigate the matter. *Id.* Dorr did not identify any staff member. *Id.*

 **\*4** Gonzalez treated the letter as a complaint and assigned Tad Adams ("Adams"), a Risk Management Specialist, to review the allegations and formulate a response. [17] Gonzalez Decl. ¶¶ 13–14. Adams reviewed Coffeey's treatment record including progress notes from his treatment team. Dkt. No. 26 at 18. Adams concluded that the decision to confine Coffeey to constant observation and temporary restrictions was reassessed daily by a physician in accordance with CNYPC policy. *Id.* at 19. On June 12, 2013, Adams responded to Dorr and annexed a copy of his Patient Complaint Summary. *Id.* at 18–19, 23. Adams advised Dorr that Coffeey was offered assistance with completing his BCA in a group setting on Wednesday evenings. *Id.* at 23. In this clinician-facilitated group, Coffey was afforded time to work on the BCA with staff assistance. *Id.*

On June 12, 2013, Gonzalez received a second letter from Dorr, dated June 11, 2013. Dkt. No. 26 at 4–5. Dorr indicated that Coffeey "fear[ed] for his safety" because he reported the alleged abuse to risk management. *Id.* at 4. Specifically, Coffeey reported to Dorr that, on two occasions, Hollenbeck removed food from Coffeey's tray. *Id.* Coffeey claimed that Hollenbeck unwrapped Coffeey's hamburger and bit a piece before offering it to Coffeey, ate Coffeey's sandwich, and removed his milk. *Id.* Coffeey alleged that Hollenbeck threatened him with returning Coffeey to ward 504, and physical assault, if he reported the incidents. *Id.* Dorr requested an investigation and suggested that Gonzalez "take steps to protect" Coffeey from potential retaliation by staff members and to separate Coffeey from Hollenbeck. *Id.* Gonzalez assigned the matter to Valerie Nester ("Nester"), a Risk Management Specialist, for review. [18] Gonzalez Decl. ¶ 18.

On June 12, 2013, Nester interviewed Coffeey. Dkt. No. 26 at 1–2. Coffeey executed a written statement related to the incidents with Hollenbeck. *Id.* at 6–8. Coffeey claimed that he was sent to Ward 504 on June 3, 2013 at 12:30 p.m. *Id.* at 6. Coffeey was on Ward 504 until June 6, 2013. *Id.* Coffeey asserts that on June 7, 2013, Hollenbeck ate his food and on June 8, 2013, Hollenbeck took a bite out of Coffeey's hamburger and gave his drink to another aide. *Id.* at 6–7. Coffeey stated that on June 10, 2013, Hollenbeck threatened him and told him not to tell anyone, "what went on up on 504." *Id.* at 7. Hollenbeck warned that Coffeey should "remember what [Hollenbeck] did to [him] last time [Coffeey was] on 401." *Id.* Coffeey alleged that Hollenbeck then "slammed" his head into a window screen and put his hands around Coffeey's neck. *Id.* at 7–8. Coffeey reported that there were no staff or resident witnesses to these occurrences. *Id.* at 8.

On June 19, 2013, Nester interviewed SCTA David Paulson ("Paulson"). Dkt. No. 26 at 1. Paulson executed a written statement indicating that he was working on Ward 504 on June 7, 2013 and June 8, 2013. *Id.* at 9. Paulson did not see anyone eat Coffeey's food or threaten Coffeey. *Id.* Paulson did not see Hollenbeck put his hands on Coffeey. *Id.*

On June 20, 2013, Nester interviewed Hollenbeck. Dkt. No. 26 at 1. Hollenbeck executed a written statement and asserted that he was not working on Ward 504 on June 7, 2013, June 8, 2013 or June 10, 2013. *Id.* at 10. Hollenbeck further claimed that he was not working on Ward 405 on June 10, 2013. *Id.* Hollenbeck conceded that he worked on Ward 504 for "a few shifts but [he] can't remember the exact dates." *Id.* Hollenbeck stated that he did not eat Coffeey's food, threaten Coffeey, or put his hands on Coffeey. *Id.*

On June 27, 2013, Nester interviewed SCTA Dan Wiginton ("Wiginton"). Dkt. No. 26 at 1. Wiginton executed a written statement stating that he was on Ward 504 for one shift when Coffeey was present. *Id.* at 11.

Wiginton indicated that he "might have been working with SCTA Hollenbeck[.]" *Id.* Wiginton did not see Hollenbeck take Coffeey's food, threaten Coffeey or put his hands on Coffeey. *Id.*

**\*5** On June 27, 2013, after interviewing witnesses and reviewing all pertinent documentation, Nester issued a report and concluded that there was no evidence to support Coffeey's contentions. Dkt. No. 26 at 2. On July 3, 2013, Gonzalez responded to Dorr advising that an investigation into Coffeey's complaint was completed and that the summary was available for her review, upon request. *Id.* at 3.

On August 30, 2013, Gonzalez received a letter from Dorr dated August 29, 2013. Gonzalez Decl. ¶ 26; Dkt. No. 26 at 21. Dorr expressed concern that Gonzalez "unilaterally downgraded" Coffeey's allegations without explanation. Dkt. No. 26 at 21. Dorr stated that Gonzalez did not follow procedures set forth in the OMH Manual for Special Investigations that required Gonzalez to consider the allegations "reasonably reliable[.]" *Id.*

On September 20, 2013, Gonzalez responded to Dorr stating that "each case is addressed on an individual basis and may not require the same level of investigation and analysis." Dkt. No. 26 at 20. Based upon the conclusions of two investigations conducted, Gonzalez determined that there was no evidence of neglect or abuse and that a special investigation was not warranted. Gonzalez Decl. ¶ 28.

### B. Procedural History

On February 26, 2014, Coffeey filed his complaint in this action. Dkt. No. 1. Upon review of Coffeey's complaint, the Court directed defendants to respond to the allegations in the complaint. Dkt. No. 8. On April 1, 2015, defendants filed the within motion pursuant to Fed.R.Civ.P. 56 seeking summary judgment and dismissal of Coffeey's complaint. Dkt. No. 24. Coffeey did not oppose the motion.

### III. DISCUSSION [19]

In the complaint, Coffeey alleges that he was subjected to Fourteenth Amendment violations related to his

conditions of confinement, food tampering, medical treatment and the use of excessive force. *See generally* Compl.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it is supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. Fed R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223–24 (2d Cir. 1994).

**\*6** Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest,"... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we

should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law,"...

*Id.* (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

### B. Fourteenth Amendment

The rights of an involuntarily committed individual should be evaluated under the standard applied to claims brought by pretrial detainees. *Buthy v. Comm'r of Office of Mental Health of N.Y. State,* 818 F.2d 1046, 1051 (2d Cir. 1987) (applying the levels of protection afforded pretrial detainees under the due process clause to persons confined due to an acquittal by reason of insanity or to their incompetence to stand trial). The standards when evaluating deliberate indifference to a person in custody are identical whether under the Eighth or Fourteenth Amendment. *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir. 2009) ("[Deliberate indifference] claims ... should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); *see also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199–200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being ... [including] food, clothing, shelter, medical care, and reasonable safety ....") (citations omitted). Accordingly, cases analyzed under the Eighth Amendment provide guidance in analyzing cases considered under the Fourteenth Amendment. As Coffeey was civilly committed during the relevant time period, his claims are more appropriately brought under the Fourteenth Amendment Due Process Clause rather than the Eighth Amendment.

### 1. Conditions of Confinement

Coffeey contends that he was subjected to unconstitutional conditions of confinement when he was placed in a "side room" from May 29, 2013 through June

3, 2013 without sheets, blankets, pens, paper, or phone and mail privileges. Dkt. No. 1 at 4.

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (citations omitted). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective and a subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir. 1996). Thus, "a prisoner may prevail only where he proves both an objective element–that the prison officials' transgression was sufficiently serious–and a subjective element–that the officials acted, or omitted to act, with a sufficiently culpable state of mind...." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted). The objective prong can be satisfied by conditions of confinement which, in combination may constitute an Eighth Amendment violation, "when each would not do so alone," such as "when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets." *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (quoting *Wilson v. Seiter,* 501 U.S. 294, 304 (1991)). However, "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (quoting *Wilson,* 501 U.S. at 305).

#### a. Confinement Pursuant to Constant Observation Order

**\*7** Coffeey's treatment team made the decision to confine him to the "side room" for four days due to Coffeey's abusive, threatening and impulsive behavior. Dkt. No. 26–1 at 4–5; Dkt. No. 26 at 37–52. The decision to renew the Order confining Coffeey to "constant observation" was made after Coffeey continued to display this behavior and threatened to harm himself. *Id.* The uncontroverted evidence before the undersigned establishes that Coffeey was monitored and reassessed daily, in accordance with CNYPC policy. Dkt. No. 25 at 7, 15–19, 25–26, 28–56; Dkt. No. 26–1 at 4–10, 13, 16–18, 25, 31. Based upon the record and Coffeey's documented behavior, his four day confinement in the "side room" did not

amount to a constitutional violation. *See McMillian v. Cty. of Onondaga,* No. 13–CV–1124 (TJM/ATB), 2015 WL 1403459, at *17 (N.D.N.Y. Mar. 26, 2015) (finding no constitutional violation as the plaintiff's behavior warranted "extra observation" and contemporaneous records established that the plaintiff was supervised during his restricted confinement).

With respect to the conditions imposed during Coffeey's side room confinement, i.e., the deprivation of sheets, blankets, pens, pencils and a loss of mail and phone privileges, (Compl. at 4), while the conditions may have been unpleasant, Coffeey has failed to present any evidence establishing that the conditions posed a threat to his health or safety. *See Inesti v. Hogan,* No. 11 Civ. 2596(PAC)(AJP), 2013 WL 791540, at *25 (S.D.N.Y. Mar. 5, 2013) (holding that the plaintiff's constitutional rights were not violated when he was ordered to wear only a "smock" because he was "out of control") (citing *Borges v. McGinnis,* No. 03–CV–6375, 2007 WL 1232227 at *6 (W.D.N.Y. Apr. 26, 2007) (keeping inmate clothed only in paper gown and paper slippers with a thin mattress and no blanket in a room with an open window for three days did not meet the objective element of an Eighth Amendment violation where "plaintiff [did] not allege that he suffered anything more than frustration and discomfort")); *see Ahlers v. Nowicki,* No. 9:12–CV–0539 (DNH/RFT), 2014 WL 1056935, at *5 (N.D.N.Y. Mar. 18, 2014) (concluding that the claim by CNYPC resident that he was "forced to sleep on dirty sheets for four nights" was a minimal deprivation, at best). Coffeey's allegation that he was denied pens, paper, mail and phone privileges are not deprivations that "violate the contemporary standards of decency." *See Mills v. Luplow,* No. 04–CV–00005(A)(M), 2009 WL 2606240, at *10 (W.D.N.Y. Mar. 31, 2009) (holding that a six day deprivation of law library services, recreation, television and access to grievance protocols did not violate the Eighth Amendment).

Even assuming that Coffeey established that his conditions of confinement were objectively inhumane, summary judgment is nonetheless warranted based upon the lack of any evidence that would permit a rational jury to conclude that Hollenbeck or Gonzalez were responsible or personally involved in the alleged unconstitutional conditions. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)).

Conspicuously absent from Dorr's letter are the names or any identifying features of any individuals responsible for Coffeey's conditions of confinement in the side room. Moreover, the record is void of any evidence establishing that Hollenbeck or Gonzalez were responsible or involved in the decision to confine Coffeey to the side room or the restrictions imposed during that confinement. Hollenbeck asserts that he did not have any contact with Coffeey until June 4, 2013. Hollenbeck Decl. (Dkt. No. 24–5) ¶ 21. Coffeey has not come forward with any admissible evidence to suggest otherwise. Similarly, Gonzalez avers that he was not personally involved in any incident involving Coffeey's confinement and had no knowledge of the confinement until after the Constant Observation Order was discontinued. Gonzalez Decl. ¶¶ 29–30. Coffeey has failed to present any admissible evidence establishing what personal involvement Gonzalez had with respect to his confinement in the side room. [20] The progress records and daily logs contain names of various nurses, doctors, social workers and SCTAs who were involved in Coffeey's treatment. None of these individuals are defendants herein.

**\*8** Accordingly, the undersigned recommends that defendants' motion for summary judgment on this ground be granted.

### 2. Food Tampering

Coffeey asserts that on June 7, 2013 and June 8, 2013, Hollenbeck took food off of his tray, took bites out of his food and returned the food to Coffeey and directed him to "eat it[.]" Dkt. No. 1 at 4.

The Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir. 1983) (citation omitted); *Brown v. Eagen,* No. 9:08–CV–0009 (TJM/DRH), 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009) (citations omitted); *Midalgo v. Bass,* No. 9:03–CV–1128 (NAM/RFT), 2006 WL 2795332, at *11 (N.D.N.Y. Sept. 26, 2006) (citations omitted). "Depriving an inmate of food or

serving him contaminated food may constitute a violation of the Eighth Amendment." *Moncrieffe v. Witbeck,* No. 97–CV–253 (NAM), 2000 WL 949457, at *6 (N.D.N.Y. June 29, 2000) (citing *Robles,* 725 F.2d at 15) (additional citations omitted). Allegations of food tampering alone do not suffice to establish an Eighth Amendment violation; in addition, a plaintiff must allege that he suffered a "distinct and palpable injury[.]" *M.F. v. Reish,* No. 95 CIV. 4904(SAS), 1996 WL 345953, at *4 (S.D.N.Y. June 21, 1996) (dismissing food tampering claims where plaintiffs allege numerous incidents of food tampering by defendants, but no allegations that they were actually harmed by such food) (quotation marks omitted) (citing *Warth v. Seldin,* 422 U.S. 490, 501 (1975)).

Here, Coffeey does not specifically allege where the alleged food tampering occurred. The evidence establishes that Coffeey was confined in Wards 405 and 504 during the relevant time period. Dkt. No. 26 at 12–17. In his statement to Nester, Hollenbeck claimed that he was not working on Ward 504 on June 7, 2013 and June 8, 2013. [21] *Id.* at 10. The progress notes and daily logs from June 7, 2013 and June 8, 2013, related to Coffeey, lack any reference to Hollenbeck. *See* Dkt. No. 25 at 6; Dkt. No. 25–1 at 2–12. Even assuming that a triable issue of fact exists as to whether Hollenbeck was on duty on June 7, 2013 and June 8, 2013 on the ward where Coffeey was present, Coffeey has failed to present any evidence that he suffered from a "distinct and palpable injury" as a result of the alleged food tampering. Coffeey's food tampering claims against Hollenbeck fail to rise to a level of constitutional significance and are therefore subject to dismissal. Accordingly, the undersigned recommends that defendants' motion for summary judgment on this ground be granted. *See Harris v. Ashlaw,* No. 9:07–CV–0358 (LEK/DEP), 2007 WL 4324106, at *5 (N.D.N.Y. Dec. 5, 2007) (dismissing the plaintiff's food tampering claim as the plaintiff failed to allege that he was served nutritionally inadequate food or that his food was served in a manner presenting danger to his health or well being).

### 3. Deliberate Indifference to Medical Needs

**\*9** Coffeey alleges that while he was confined for four days in the "side room[,]" he was not seen "regularly" by a doctor. *See* Compl. at 9.

An Eighth Amendment claim for medical indifference, has two necessary components, one objective and the other subjective. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir. 1996). Deprivation of medical treatment is "sufficiently serious" if the injury is one where there is, "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting)). " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir. 2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no bright-line rule to determine whether a medical condition is sufficiently serious, the Second Circuit has identified several factors that are highly relevant to the inquiry such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir. 2003) (citing and quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998) (internal citation omitted)).

Under the subjective element, a prison official acts with a culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66 (citation omitted). To assert a claim for deliberate indifference, an inmate must allege that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702. "[M]ere disagreement over proper treatment does not create a constitutional claim ..." as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a *section*

1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

In this case, even assuming that Coffeey's mental condition was a "serious medical condition" sufficient to establish the objective element of the Eighth Amendment analysis, Coffeey's conclusory allegation that "he did not see a doctor regularly," is not supported by admissible proof. Coffeey does not present any evidence that he requested and was denied medical treatment. Indeed, the record belies Coffey's claim and establishes that Coffeey was treated by physicians and nursing staff, and continually monitored by SCTAs during his four day confinement in the side room. Dkt. Nos. 25 at 7, 15–19, 25–26, 28–57; Dkt. No. 26 at 39–51; Dkt. No. 26–1 at 2–10, 13, 16–18, 25, 31. During an examination by Dr. Elizabeth Farnum on June 3, 2013, Coffeey complained that he did not see a doctor but when he was asked why he needed to be seen, Coffeey stated that he did not request a doctor and that he was not experiencing any problems. Dkt. No. 26–1 at 21. Coffeey's "dissatisfaction" with his level of care and course of treatment does not support a finding of deliberate indifference. *See Soto v. Wright,* No. 11 Civ. 2289, 2013 WL 474291, at *5 (S.D.N.Y. Feb. 1, 2013) (citations omitted).

**\*10** Moreover, Coffeey does not present any evidence from which a reasonable fact finder could conclude that defendants acted with a "sufficiently culpable mental state." *Salahuddin* v. Goord, 467 F.3d 263, 282 (2d Cir. 2006) (citation omitted). Coffeey does not identify any physician, health care provider or any other individual responsible for any delay or deprivation of medical treatment. There is no evidentiary support for any medical indifference claim against Hollenbeck or Gonzalez. The record lacks any evidence establishing that either defendant was personally involved in any decision related to Coffeey's medical care during his four-day confinement to the side room. [22] Accordingly, the undersigned recommends that defendants' motion for summary judgment on this ground be granted.

### 4. Excessive Force

Coffeey claims that on June 10, 2013, Hollenbeck slammed his head into a window screen and put his hands on Coffeey's throat. [23] *See* Dkt. No. 26 at 7–8.

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson,* 503 U.S. at 9–10. The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir. 2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation *per se* [,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (internal quotation marks and citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims,* 230 F.3d at 21 (internal quotation marks and citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344

F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

**\*11** In this case, Coffeey fails to satisfy either prong of the analysis. In viewing the facts in the light most favorable to Coffeey, the evidence fails to establish that he suffered any injury as a result of the alleged altercation with Hollenbeck. Indeed, Coffeey does not plead that he sustained any injury as a result of the alleged altercation. The progress notes and daily logs for June 10, 2013 do not contain any reference to any injury that Coffeey allegedly sustained and there is no medical record of any assault. Dkt. No. 25–1 at 15–17, 19–21; Dkt. No. 26 at 15.

With respect to the subjective prong, the credible evidence fails to establish that Hollenbeck acted with a culpable state of mind. Hollenbeck asserts that he did not work on Ward 405 on June 10, 2013 and denies that the incident occurred at any time. [24] Hollenbeck Decl. ¶¶ 23–26, 28. Even assuming that Hollenbeck was present on the day in question, the record lacks any evidentiary support for Coffeey's general accusations. The progress notes and daily logs for June 10, 2013 do not contain any reference to any assault or incident involving Hollenbeck. Dkt No. 25–1 at 15–17, 19–22; Dkt. No. 26 at 15. Coffeey concedes that there were no witnesses to the alleged occurrence. Dkt. No. 26 at 8. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Ketzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998) (citing *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir. 1998)). In viewing the record in a light most favorable to Coffeey, the lack of evidence with respect to Hollenbeck's conduct, coupled with the absence of any injury, fails to present a triable issue of fact for a jury to resolve. Accordingly, the undersigned recommends that defendants' motion for summary judgment on this ground be granted. *See Phelps v. Szubinski,* 577 F.Supp.2d 650, 663 (E.D.N.Y.2008) (granting summary judgment on excessive force claim where the plaintiff failed to establish that he sustained a physical injury as a result of the officer's conduct); *see also Patterson v. City of N.Y.,* No. 14–cv– 5330 (PKC), 2015 WL 8362702, at \*5 (S.D.N.Y. Dec. 8, 2015) ("Because the defendants have come forward with evidence that they were not in the vicinity of [the plaintiff] at the time that he allegedly was subjected to excessive force, and because [the plaintiff] raises only conclusory arguments in opposition, [the plaintiff] has failed to satisfy his burden to oppose summary judgment."); *Applegate v. Annucci,* No. 9:02–CV–0276 (LEK/DEP), 2008 WL

2725087, at \*18 (N.D.N.Y. July 10, 2008) (awarding summary judgment on excessive force claim where the plaintiff failed to file any response to the defendant's motion and the record lacked any evidence from which a reasonable juror could conclude that the defendant used excessive force).

### C. Verbal Threats

Coffeey claims that Hollenbeck threatened to "take [Coffeey] out in a body bag." *See* Dkt. No. 1 at 4. To the extent Coffeey attempted to allege a potential Fourteenth Amendment claim against Hollenbeck for making verbal threats, such a claim must fail. A claim of threats and harassment alone, without allegations of accompanied injury or use of force, is insufficient to state an Eighth Amendment claim. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir. 1996) (per curiam) ("The claim that a prison guard called [the plaintiff] names also did not allege any appreciable injury and was properly dismissed."); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983." (internal quotation marks and citations omitted)). Because the undersigned has recommended dismissal of Coffeey's excessive force allegation against Hollenbeck, Coffeey's potential claim based on verbal threats against Hollenbeck cannot survive.

**\*12** Accordingly, it is recommended that Coffeey's claim based on verbal threats be dismissed and summary judgment awarded to defendants on this ground.

### D. Supervisory Liability

Supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation[;]

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;]

(3) the defendant created a policy or custom under which 25 unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;]

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

Writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. *Smart v. Goord*, 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."). Also, it is within the purview of a superior officer to delegate responsibility to others. *See Vega v. Artus*, 610 F.Supp.2d 185, 198 (N.D.N.Y.2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation") (citing *Ortiz–Rodriguez v. N.Y. State Dep't of Corr. Servs.*, 491 F.Supp.2d 342, 347 (W.D.N.Y.2007)).

Absent an underlying constitutional violation by a subordinate, there can be no supervisory liability. *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003); *see Elek v. Inc. Vill. of Monroe*, 815 F.Supp.2d 801, 808 (S.D.N.Y.2011) (collecting cases for the proposition that "because [p]laintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability").

Here, construing the complaint liberally, Coffeey alleges that Dorr notified Gonzalez of constitutional violations and that Gonzalez failed to remedy the alleged violations. Compl. at 4, 9–13. Coffeey does not allege, nor does the record support the conclusion that Gonzalez directly participated in any alleged constitutional violations. Gonzalez concedes that he received Dorr's letters and referred Dorr's concerns to staff members. Gonzalez Decl. ¶¶ 13–14, 17–18. Gonzalez's responses to Dorr denying

Coffeey's accusations are insufficient to establish personal involvement in any incident. *See Joyner v. Greiner*, 195 F.Supp.2d 500, 506 (S.D.N.Y.2002). Gonzalez's actions do not equate to "personal involvement" in any alleged violations. *See Vega*, 610 F.Supp.2d at 198 (finding that a supervisor is not "personally involved" because he delegated investigation of an incident to a subordinate).

**\*13** Moreover, as discussed *supra,* Coffeey failed to raise an issue of material fact with respect to his Fourteenth Amendment claims. Accordingly, the undersigned recommends that defendants' motion for summary judgment and dismissal of Coffeey's supervisory claims against Gonzalez be granted.

### E. Qualified Immunity

Defendants argue that even if Coffeey's claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd* 80 F. App'x 146 (2d Cir. 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir. 1991) ( citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir. 1990)) (additional citation omitted). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Pearson v. Callahan,* 555 U.S. 223, 232 (2009). Only if there is a constitutional violation does a court proceed to determine whether constitutional rights were clearly established at the time of the alleged violation. *Id.* at 236.

Here, the second prong of the inquiry need not be addressed with respect to Coffeey's claims because, as discussed *supra,* it has not been shown that defendants violated Coffeey's constitutional rights. Accordingly, in the alternative, it is recommended that defendant's motion on this ground be granted.

## IV. CONCLUSION

For the reasons stated above, it is hereby:

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 24) be GRANTED in all respects as to all claims and defendants; and it is further

**ORDERED** that the Clerk serve a copy of this Report–Recommendation and Order on the parties in accordance with Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL**

PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir. 1989); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

**All Citations**

Slip Copy, 2016 WL 770087

Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    Defendants' "Notice of Motion" indicated that, "[a] copy of the United States District Court, Northern District of New York 'Notification of the Consequences of Failing to Respond to a Summary Judgment Motion' is annexed hereto." Dkt. No. 24 at 1. No such notice was annexed to defendants' motion. The Court notified the plaintiff of the consequences of failing to oppose the motion. Dkt. No. 27.

3    Coffeey's complaint is not verified and does not have the "force and effect of an affidavit." *See Tafari v. Brown,* No. 9:10–CV–1065 (GTS/DRH), 2012 WL 1098447, at *6 n.8 (N.D.N.Y. Mar. 30, 2012).

4    Local Rule 7.1(a)(3) states:

     Summary Judgment Motions

     Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

     The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

     N.D.N.Y. L.R. 7.1(a)(3).

5    Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

6    The aide who observed the incident and the aide involved in the incident with Coffeey are not defendants in this action.

7    The physician is not a defendant in this action.

8    Off-ward activity included the Activity Center and/or Treatment Mall. Dkt. No. 25–1 at 51.

9    The SCTA and staff involved in this incident are not defendants in this action.

10    The nurse and Dr. Kaskiw are not defendants in this action.

11     The physician who issued the Order is not a defendant in this action.

12     The physician who issued the Order is not a defendant in this action.

13     The physician who issued the Order is not a defendant in this action.

14     The physician who issued the Order is not a defendant in this action.

15     The physician is not a defendant herein.

16     According to CNYPC policy, a resident is placed in the MOD Unit when he provides assurances to staff that he is able to interact with residents and staff without posing a threat to security, but the resident has not maintained behavioral control for a sufficient duration and presents as unwilling to control other antisocial behaviors. Dkt. No. 24–7 (Hollenbeck Decl. Exh. C) at 3.

17     Adams is not a defendant in this action.

18     Nester is not a defendant in this action.

19     All unpublished opinions cited to by the undersigned in this Report–Recommendation are, unless otherwise noted, attached to this Report–Recommendation.

20     To the extent that Coffeey's Cir. asserting a supervisory claim against Gonzalez, that claim is discussed *infra.*

21     In Hollenbeck's June 20, 2013 signed statement, Hollenbeck stated, "I was not working Ward 504 on June 7th, 8[th] or 10[th], nor was I working 405 on 6/10. I did work on Ward 504 for a few shifts, I can't remember the exact dates." Dkt. No. 26 at 10. In Hollenbeck's Declaration submitted in support of the within motion, Hollenbeck avers, "I was not working on the ward on June 7, 2013, June 8, 2013 or June 10, 2013." Hollenbeck Decl. ¶ 26. To the extent that Hollenbeck's statements in his Declaration are inconsistent or contradictory to the written statement he signed in June 2013, the Court will rely upon the statements made in June 2013. *See Yevstifeev v. Steve,* 860 F.Supp.2d 217, 221 (W.D.N.Y.2012) ( "[T]he Court rejects plaintiffs' attempts to raise new issues of fact by submitting affidavits which contradict their deposition testimony and prior written statements, because 'factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not genuine issues for trial.' " (internal quotation marks and citations omitted)).

22     To the extent that Coffeey's complaint could be construed as asserting a supervisory claim against Gonzalez, that claim is discussed *infra.*

23     The Court notes that this allegation is contained in a statement, signed by Coffeey, and dated June 12, 2013, submitted by defendants as an exhibit to the affirmation of Colleen Galligan, counsel for defendants. Dkt. No. 26 at 7–8. Coffeey did not raise an allegation of excessive force in his complaint. The Court notes that there is caselaw in this Circuit declining to address claims that are not properly raised in the complaint or other submissions by the plaintiff. *See Wright v. Goord,* 554 F.3d 255, 267 (2d Cir. 2009) (stating that the plaintiff could not add a cause of action by "simply appending [the] claim to his second amended complaint"); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 358 n.17 (N.D.N.Y.2010) (declining to address verbal abuse where the allegation was contained in a grievance, but not raised in the plaintiff's amended complaint or at his deposition). Nonetheless, the Court will address this claim based on the evidence before it.

24     *See* n.21, *supra.*

**End of Document**              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by COFFEEY v. HOLLENBECK, 2nd Cir., March 23, 2016

2016 WL 796081
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gene M. Coffeey, Plaintiff,
v.
Hollenbeck, et al., Defendant.

9:14-CV-196
|
Signed 02/22/2016

**Attorneys and Law Firms**

GENE M. COFFEEY, Plaintiff, Pro Se, 34611, CNY PC, PO Box 300, Marcy, NY 13403.

COLLEEN D. GALLIGAN, ESQ., Ass't Attorney General, HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, Attorneys for Defendant, The Capitol, Albany, NY 12224.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge

**\*1** Pro se plaintiff Gene M. Coffeey brought this civil rights action pursuant to 42 U.S.C. § 1983. On January 27, 2016, the Honorable Christian F. Hummel, United States Magistrate Judge, advised by Report-Recommendation that defendants' motion for summary judgment be granted, and the complaint be dismissed in its entirety. See ECF No. 24. Plaintiff submitted a response in which he broadly objected to the Report-Recommendation and requested appellate review of the instant matter. See ECF No. 40. This has been construed as an objection to the substance of the entirety of the Report-Recommendation, giving rise to a de novo review.

Based upon this de novo review of the Report-Recommendation, the Report-Recommendation is accepted in whole. See 28 U.S.C. § 636(b)(1).

Therefore, it is ORDERED that:

1. Defendants' motion for summary judgment is **GRANTED**, and the complaint is **DISMISSED IN ITS ENTIRETY**; and

2. The Clerk serve a copy of this Decision and Order upon plaintiff in accordance with the Local Rules.

The Clerk of the Court shall enter judgment and close this case.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 796081

© 2016 Thomson Reuters. No claim to original U.S. Government Works.